RAINEY, et al. *v.* HORN.

May 17, 1954

No. 39060 65 Adv. S. 21 72 So. 2d 434

*Overton A. Currie, Edward J. Currie, W. Arlington Jones,* Hattiesburg; *Quitman A. Ross,* Laurel, for appellants.

*O. F.* and *J. O. Moss,* Lucedale, for appellee.

GILLESPIE, J.

The appellants, L. L. Rainey, his wife, Mrs. Ivon Beatrice Rainey, and their four minor children, sued appellee in the Circuit Court of George County for the wrongful death of Mrs. Rainey's unborn child. The declaration, as amended, is based on Code Section 1453, the wrongful death statute. The trial in the lower court resulted in a hung jury, whereupon the court entered an order of mistrial and continued the case for further hearing. The appellee then filed a motion for judgment notwithstanding the mistrial verdict. The court sus-

tained this motion on the ground that appellee was entitled to a peremptory instruction, and dismissed the suit.

This appeal presents two questions: (1) Does an action lie under Code Section 1453 for the negligent killing of an unborn child which was viable and capable of a separate and independent existence apart from the mother? (2) Was the proof of negligence sufficient to create a jury issue?

The first stated question is one of first impression in this State. We answer both questions affirmatively. We first consider the second question.

██ █ The facts are in sharp dispute. We state them most favorably to appellants for the purpose of determining whether they presented a jury issue on the question of negligence. It should be said in justice to the appellee, Dr. Horn, that he denied all the factual contentions of appellants.

Appellants live in a rural area of George County. Four children had previously been born to Mr. and Mrs. Rainey. She became pregnant with her fifth child. Mrs. Rainey consulted Dr. J. W. Horn, the appellee, who was about 72 years of age. Her pregnancy was normal. The new arrival was expected between Thanksgiving and Christmas. Mr. Rainey called Dr. Horn to come by and give Mrs. Rainey a check-up on December 6, as the time of the baby's arrival was thought near. On that date, at about 8 o'clock P. M., Dr. Horn went to the home of the appellants. Mrs. Rainey had a backache but she said she was not in labor. She had been up all day. The appellee examined her. Mrs. Rainey made coffee and served coffee and cake. Dr. Horn appeared nervous and gave Mrs. Rainey a pill and said, "Maybe that will bring on the time." Dr. Horn had Mrs. Rainey go to bed again for examination. Before he examined her, he put out chloroform. She was not having labor pains and her water had not broken. Dr. Horn put Mrs. Rainey

to sleep. Up to this time the baby could be felt moving in her womb and was alive. Dr. Horn then used his hands apparently in an effort to get hold of the baby. Then he got his forceps and inserted them into Mrs. Rainey and pulled for some five minutes. Mrs. Rainey was bleeding. Dr. Horn then took off his shoes and got into bed with his feet braced against Mrs. Rainey's thighs and pulled with all his strength for a period estimated by witnesses from 15 to 40 minutes. Dr. Horn, Mrs. Rainey, and the bed were bloody. One witness, a midwife, told Dr. Horn he was killing the baby, but he did not answer. There was testimony that Dr. Horn acted as if he were under the influence of narcotics—that he acted abnormal. Mr. Rainey told Dr. Horn he wanted to get his wife to a hospital and Dr. Horn said, "Do what you want to, I'm through." Mrs. Rainey was thought by one of the witnesses to be dying. One witness, a sister of Mrs. Rainey, testified she stood beside the bed and she could feel no movement of the baby after the above occurrence.

At about midnight, Mrs. Rainey was taken to a hospital where X-rays were made. The baby was shown by X-ray to be in the pelvis in a normal position. The baby was born naturally without use of instruments four hours after Mrs. Rainey got to the hospital. The baby was born dead; it was a full-term baby. It was bruised from head to foot. Another physician who arrived just before Mrs. Rainey was taken to the hospital was quoted, without objection or denial, that he "had never seen anyone butchered up like that," referring to Mrs. Rainey. Dr. Horn admitted taking Strychnine tablets for a weak condition. The theory of appellants' case was that Dr. Horn negligently tried to force the birth of the baby before Mrs. Rainey got into labor, and while abnormal from some cause, unnecessarily killed the baby by trying to force it with forceps.

Dr. Horn's defense was that when he examined Mrs. Rainey the last time that she had broken water, was

partially dilated, and was in labor; that the left arm and shoulder and umbilicus cord were presenting outside Mrs. Rainey's body, and the baby was turned in such a way that it could not be born in that position. He testified that the umbilicus cord thus presented created an emergency; that the baby would die of strangulation in five minutes. He stated that he went to work to get the baby back in position by shoving it with his hands. At the same time, he stated he worked to get the cord back in so that pressure would be relieved and thus prevent strangulation of the baby. He testified that he got the cord back in and the baby was then limp; that he was unable to turn the baby to normal position. He testified that he then went to work to bring out the baby with forceps and get life in it.

Both parties used medical evidence. Most of appellants' case was based on lay witnesses. Two physicians testified as experts tending to support Dr. Horn. The presenting of the left arm, shoulder and umbilicus cord and the emergency thereby created, was the basis of Dr. Horn justifying his actions. Dr. Horn testified that these parts of the baby were into the outside world. Three witnesses categorically denied this fact.

The evidence presented these issues of fact: (1) Whether Mrs. Rainey was in labor prior to or at the time Dr. Horn attempted to force birth of the baby by use of forceps; (2) whether Mrs. Rainey had broken water, which means the breaking of the membrane in which an unborn foetus floats in liquid; (3) whether Dr. Horn was in full control of his mental and physical faculties, or was abnormal; (4) whether the baby's left arm, shoulder and umbilicus cord presented, creating an emergency; (5) whether Dr. Horn was negligent in the unnecessary use of force on the baby, and (6) whether Dr. Horn tried to force the baby's birth before nature brought on the labor pains and dilatation of the cervix. These, at least, if not others, made a jury issue on the question of negligence. The appellee was not entitled to the peremptory

instruction. The motion for judgment notwithstanding the mistrial verdict should not have been sustained.

▉▉▉ When a physician undertakes to perform the duties of his profession, he impliedly warrants that he possesses and will use the requisite skill and care ordinarily possessed and used by others in his profession. But unsuccessful results of his treatment or action does not give rise to a presumption of negligence.

▉▉▉ We now consider the question whether an action will lie under Code Section 1453 for the negligent killing of an unborn child which was viable and capable of a separate and independent existence apart from the mother. Under Lord Campbell's act, and by most of the statutes in the United States based thereon, including our Code Section 1453, it is essential to the maintenance of the action for death by wrongful act that the wrongful act be of such character as would have supported an action by the deceased for his injuries if he had survived. It is, therefore, appropriate to examine the cases dealing with the right to maintain an action for prenatal injuries by children who survived the injuries. The cases hereinafter considered include those where the action was brought by or on behalf of living children for damages resulting from negligent prenatal injuries, and cases brought by the next of kin under wrongful death statutes for the death of the child that survived birth but died from negligent prenatal injuries.

The earliest case dealing with this subject seems to be Dietriech v. Northhampton (1884), 138 Mass. 14. In that case, the Court denied the right to maintain the action on the ground that no case had ever been decided allowing an action to be maintained by an infant that survived but was injured while in its mother's womb, and on the further ground that an unborn child is a part of its mother and any damage to it which is not too remote to be recovered at all is recoverable by the mother.

This decision was followed in 1900 by the case of Allaire v. St. Luke's Hospital, 184 Ill. 359, 56 N. E. 638, wherein a majority of the Illinois Court followed the Dietriech case. The Allaire case was thereafter for some decades one of the leading cases on the subject. In that case, Justice Boggs wrote a lengthy and strong dissenting opinion in which he said in part:

"In the case at bar the infant, when the injury was inflicted, had, as the declaration alleged, reached that advanced state of foetal life which would have, according to the experience of mankind and according to the medical learning of the age, endowed it with such vitality and vigor, and with members and faculties so far complete and mature, that it could have maintained independent life and the death of the mother would not have deprived it of life. It is but natural justice that such an infant, if born alive, should be allowed to maintain an action in the courts for injuries so wrongly committed upon its person while so in the womb of the mother. . . . If in delivering a child an attending physician, acting for a compensation, should wantonly or by actionable negligence injure the limbs of the infant, and thereby cause the child, although born alive and living, to be maimed and crippled in body or members, it would be abhorrent to every impulse of justice or reason to deny to such a child a right of action against such physician to recover damages for the wrongs and injuries inflicted by such physician . . . The law should, it seems to me, be, that whenever a child in utero is so far advanced in a prenatal age as that, should parturition by natural or artificial means occur at such age, such child could and would live separable from the mother and grow into the ordinary activities of life, and is afterwards born and becomes a living human being, such child has a right of action, for any injuries wantonly or negligently inflicted upon his or her person at such age of viability, though then in the womb of the mother. That proposition having been established, that an ad-

justment of damages with the mother could not preclude the child would naturally and necessarily follow. The argument there can be no certainty an unborn child is dead or alive when an injury is inflicted upon the mother is answered by the allegations of the declaration that the plaintiff was born alive and is a living human being. There was, therefore, no uncertainty as to the fact the plaintiff was alive in the mother's womb when the injuries were inflicted.''

This dissenting opinion of Justice Boggs set forth the reasoning on which a number of other courts allowed recovery in such cases. Eventually, as will be noted hereinafter, the Illinois Court finally adopted the reasoning of Justice Boggs in his dissenting opinion in the Allaire case.

The rule denying recovery in such cases, as first laid down in Dietriech v. Northhampton, supra, and later followed in Allaire v. St. Luke's Hospital, supra, became the majority rule and was subsequently followed by the Courts of Alabama, Michigan, Missouri, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas, and Wisconsin. See Anno., 10 A. L. R. 2d 1059.

The case of Allaire v. St. Luke's Hospital, supra, has as recently as 1953 been overruled by the Supreme Court of Illinois in Amann v. Faidy, 415 Ill. 422, 114 N. E. 2d 412. Justice Boggs' dissenting opinion has now become the law in Illinois.

In 1913, the Missouri Court, in the case of Buel v. United R. Co., 248 Mo. 126, 154 S. W. 71, followed the majority rule denying recovery. In 1953, the Buel case was overruled in Steggall, et al. v. Morris, 258 S. W. 2d 577.

In 1921, the New York case of Drobner v. Peters, 232 N. Y. 220, 133 N. E. 567, followed the case of Dietriech v. Northhampton, supra, and denied recovery. In the recent case of Woods and Others v. Lancet (1951), 303 N. Y. 349, 102 N. E. 2d 691, 27 A. L. R. 2d 1250, New York's Court of Last Resort re-examined its previous

position announced in the Drobner case and after lengthy consideration of the trend of authority on the subject, overruled Drobner v. Peters, supra.

Ohio first applied the rule denying recovery in such cases in Mayes v. Weingarten, 82 N. E. 2d 421 (1943), which followed an earlier Ohio case. But in Williams v. Marion Rapid Transit Inc. (1949), 152 Ohio St. 114, 87 N. E. 2d 334, 10 A. L. R. 2d 1051, the Ohio Supreme Court in effect overruled Mayes v. Weingarten, supra, and held that a right of action exists for the death of an infant that died as a result of prenatal injuries.

One of the earliest cases departing from the majority rule denying recovery appears to be the case of Montreal Tramways v. Livcille (1933), Can. S. C. 456, 4 D. L. R. 337. However, an earlier decision in Louisiana was rendered in the case of Cooper v. Blanck (1923), 39 So. 2d 352. This Louisiana case permitted recovery, but the opinion was not published until 1949.

Of the more recent cases, we find the Georgia Court allowing recovery in the case of Tucker v. Carmichael (1951), 208 Ga. 201, 65 S. E. 2d 909. The question was examined by the Supreme Court of Georgia as one of first impression.

Likewise the State of Maryland, in the case of Damasiewicz v. Gorsuch, (1951), 79 Atl. 2d 550, held that a child who was injured while en ventre sa mere and who was prematurely born permanently blind because of the accident was entitled to recover. This likewise was a case of first impression with the Maryland Court and Chief Justice Marbury rendered a lengthy and well reasoned opinion in which he stated: ''In view of the confused state of the law elsewhere, and the practically unanimous criticism of majority cases by writers on the subject, and in view of the numerous dissenting opinions in these cases, we can not regard them as compelling authority. When we examine the reasons behind them, we find them based on an outworn point of view, now rejected by modern medicine, and rejected by the

later cases. We think the modern view is the correct one, and, since there has heretofore been no occasion to decide what is our common law and we must for the first time decide it now, we think our decision should be made on the basis of present day knowledge. To hold otherwise would be a step backward and would substitute a plebiscite of states for reason.''

We will not unduly lengthen this opinion with citation of all of the cases on the subject. We observe that some years ago the overwhelming weight of authority followed the rule originally announced in Dietriech v. Northhampton, supra, and Allaire v. St. Luke's Hospital, supra, denying the right of recovery. Today the authorities from those states that have dealt with the question are nearly evenly divided, indicating a rapid trend away from the view denying the right of the child to recover. An exhaustive annotation on the question of prenatal injury as ground for action is found in 10 A. L. R. 2d 1059, et seq., which is supplemented in 27 A. L. R. 2d 1256, et seq.

The reasons advanced in support of the rule favoring the denial of recovery are: (1) In the earlier cases the lack of precedent and stare decisis; (2) whether a prenatal injury was the cause of the death or the condition of the child would be based upon conjecture or speculation; (3) the unborn child is a part of the mother, hence no duty is owing it; (4) if the action could be maintained, an infant may maintain an action against its own mother for injuries occasioned by the negligence of the mother while pregnant with it, and (5) permitting recovery might give rise to fictitious claims.

Many of the recent cases have dealt exhaustively with these reasons. As to the first, we are not now lacking in precedent, nor are we bound under the doctrine of stare decisis. The second reason is invalid in our jurisdiction because judgments may not be based on speculation or conjecture. As to the third reason, it has well been said that a foetus in the womb of the mother may

be regarded as being a part of the bowels of the mother during a portion of the period of gestation, but if, while still in the womb, it reaches the prenatal age of viability when the destruction of the life of the mother does not necessarily end its life also, and when, if separated from its mother, it would be so far a matured human being that it would live and grow as other children, it is but to deny a palpable fact to argue that there is but one life, and that the life of the mother. The fourth reason is untenable in this jurisdiction because a child can not sue its mother in tort. 68 Miss. 703, 9 So. 885. The fifth reason numbered above should have no weight in preventing legitimate claims from being heard; the possibility of fraud being no greater in this type of case than in many other types of tort claims. It must be assumed that our courts are capable of eliminating fake and fraudulent contentions.

On the other hand, the reasons usually advanced by those courts that allow recovery for prenatal injury are (1) an unborn viable child is capable of independent existence, hence should be regarded as a separate entity; (2) if the law recognizes an unborn child sufficiently to protect its property rights and rights of inheritance and protects it against the crimes of others, it should recognize its separate existence for the redressing of torts; (3) if no right of action is allowed, there is a wrong inflicted for which there is no remedy and (4) natural justice.

The origin and development of the rule favoring a denial of recovery in such cases appears to have been one of convenience, and has been the subject of strong criticism both in dissenting opinions and by various writers for many years. The harshness of the rule is at once apparent.

While the question considered in the cases hereinabove discussed deal directly with infants who survive birth, the question for our decision involves death of the infant before birth. Only a few cases are reported in-

volving the right of the next of kin to maintain an action under statutes patterned after Lord Campbell's act for the wrongful death of an unborn child. It is generally held that such action may not be maintained. See Anno., 10 A. L. R. 2d 639, et seq. The earliest case involving this question appears to be Cooper v. Blanck, supra.

In the case of Verkennes .v. Corniea (1949), 38 N. W. 2d 838, 10 A. L. R. 2d 1034, the Minnesota Supreme Court decided the question here under review. It was there held that the administrator of an estate of an unborn viable infant whose death before birth resulted from the negligence of the physician in charge of the mother and of the maternity hospital where the mother was confined, could maintain an action under the wrongful death statute for the death of the infant.

 While the action in this case is a statutory one under Code Section 1453, we look to the common law to determine the question before us. By the words of the statute, the action lies if the negligent act would have entitled the injured party to maintain an action if death had not ensued. We have here a question of law not previously decided by this Court. The Courts of other States are divided on the question. It is, therefore, our duty to carefully consider the reasoning and experience of those courts that have dealt with the question and announce the common law consistent with its broad ancient principles and the needs of present day usages and concepts.

"The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation. Life is the immediate gift of God, a right inherent by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb. An infant en ventre sa mere, or in the mother's womb, is supposed in the law to be born for many purposes. It is capable of having a legacy or a surrender of a copy-

hold estate made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use and to take afterwards by such limitation, as if it were then actually born.'' Blackstone's Commentaries, Book 1, page 30.

The broad principles of the common law embrace the subject of our inquiry in this case. We find no sound reason why we should withhold the processes of the law from an unborn child that has reached the prenatal age of viability when it is capable of a separate and independent existence from its mother. Such child is entitled to the protection of its person.

 We hold, therefore, that an unborn child, after it reaches the prenatal age of viability when the destruction of the life of its mother does not necessarily mean the end of its life also, and when, if separated from its mother would be so far a matured human being that it would live and grow mentally and physically, is a person; and if such child dies before birth as the result of the negligent act of another, an action may be maintained for its death under the wrongful death statute.

Our decision is limited to what is stated in the next preceding paragraph. We do not pass upon the question of the negligent injury or death of a foetus at an earlier age than stated above.

Reversed and remanded.

All justices concur.