642 So.2d 332 (1994)
Brenda Joyce SWEENEY, Kevin Sweeney, Brendi Lashawn Sweeney, a Minor, by her Adult Next Friends, and Bronzie Shannon Sweeney, a Minor, by her Adult Next Friends
v.
W.H. PRESTON, M.D.
No. 90-CA-01336.
Supreme Court of Mississippi.
April 7, 1994.
Rehearing Denied September 29, 1994.
Roy O. Parker, Roy O. Parker, Jr., Roy O. Parker & Associates, Tupelo, for appellants.
Robert G. Krohn, Price Krohn & McLemore, Corinth, for appellee.
En Banc.
McRAE, Justice, for the Court:
This appeal arises from a December 10, 1990, order of the Prentiss County Circuit Court granting a motion for summary judgment in favor of Dr. W.H. Preston, M.D., on grounds that the statutes of limitations had run in medical negligence actions brought against him by the heirs of Jonathan Kevin *333 and Brandon Allen Sweeney as well as in an individual claim for personal injuries by Brenda Sweeney, the mother of the infants. Their claims stemmed from the deaths of two infant boys who succumbed to Rh factor complications attributed to Dr. Preston's alleged failure to properly type their mother's blood and administer drugs to desensitize her to the Rh antibodies. Finding that the wrongful death actions were not time-barred pursuant to our decision in Gentry v. Wallace, 606 So.2d 1117 (Miss. 1992), and that questions of fact remain to be resolved in Brenda Sweeney's personal injury action in order to determine whether the statute of limitations had run, we reverse and remand for trial.

I.
Jonathan Kevin Sweeney was born on June 26, 1984. He was delivered by Caesarean section after it was discovered in the eighth month of gestation that he suffered from Rh factor complications. Despite two complete blood transfusions, he died two days later. In the spring of 1985, his mother obtained her medical records from Dr. Preston. Those records indicated that Brenda Sweeney's blood had been mistyped during her first pregnancy in 1973, which ended with a stillbirth. Brenda stated in her affidavit that Dr. Preston then told her had he known her blood had been mistyped and that she had Rh positive blood, he would have administered the drug, Rhogram, after her first child was stillborn and the 1984 death would have been prevented. A second male child, Brandon Allen Sweeney, likewise died from Rh factor complications on April 15, 1986, two days after his birth.
Kevin and Brenda Sweeney and their daughters, Brendi LaShawn and Bronzie Shannon, filed wrongful death actions against Dr. Preston on March 23, 1987. Brenda Sweeney further alleged that Dr. Preston's negligent mistyping of her blood in 1973, and his failure to administer Rhogram after the delivery of the stillborn infant in July 1974, caused her to develop a permanent Rh iso-immunization sensitivity. The circuit court ruled that these actions were barred by both Miss. Code Ann. § 15-1-36 (Supp. 1976) and Miss. Code Ann. § 15-1-49 (1972), as amended, and granted Dr. Preston's motion for summary judgment.

II.
Miss. Code Ann. § 15-1-36, the two-year statute of limitations applicable to medical negligence actions, does not begin to run until the injured party discovers or should have discovered the negligent act and its relationship to the injury sustained. Williams v. Kilgore, 618 So.2d 51 (Miss. 1992). In contrast, Miss. Code Ann. § 15-1-49 (1972), the general statute of limitations which governed medical malpractice actions prior to 1976, then provided that "all actions for which no other period of limitations is prescribed shall be commenced within six years after the cause of action accrued, and not after." While the statute contained no definition of "accrual," it was interpreted at that time to mean that the cause of action "accrue[d] and the statute be[gan] to run on the day of the wrongful act or omission of the wrongful act or omission which constitutes the malpractice, not from the time of discovery thereof." Smith v. McComb Infirmary Association, 196 So.2d 91 (Miss. 1967), citing Wilder v. St. Joseph Hospital, 225 Miss. 42, 82 So.2d 651 (1955). After July 1, 1976, Miss. Code Ann. § 15-1-49 was no longer applicable to medical malpractice actions, having been supplanted by the legislature's enactment of Miss. Code Ann. § 15-1-36 (Supp. 1976), which created a two-year statute of limitations for medical malpractice claims which "accrued on or after July 1, 1976." While the statute shortened the limitation period, it provided a definition of "accrual" which imparted a "discovery" standard in medical malpractice cases, providing that the statute begins to run "from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." § 15-1-36(1). We explained the discovery rule in Smith v. Sanders, 485 So.2d 1051 (Miss. 1986), as follows:
The focus is upon the time that the plaintiff discovers, or should have discovered, by the exercise of reasonable diligence, that he probably had an actionable injury. The operative time is when the plaintiff *334 can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causal relationship of the injury and the conduct of the medical practitioner.

Id. at 1052 (emphasis added).
In Kilgore v. Barnes, 508 So.2d 1042 (Miss. 1987), we considered the applicability of § 15-1-36 to a claim arising from an alleged negligent act or omission occurring in 1974, but undiscovered by the plaintiff until 1982. Finding that the claim was still viable because the plaintiff had no reason to discover that part of a surgical needle had been left in the lining of his heart during a 1974 operation, we affirmed the circuit court's order denying the defendant's motion for summary judgment. Id. at 1045-1046. In so ruling, we stated that:
[w]e may not give retroactive effect to newly enacted statutes of limitations shortening the period within which a claim arising prior to enactment must be brought. [citations omitted] On the other hand, most other jurisdictions recognize the authority of legislatures to enlarge periods of limitation with respect to existing claims, that is, claims not barred at the time of elongation. [citations omitted] This is consistent with our general principle that an act remedial in its character embraces claims existing when the act was passed. [citation omitted]
Id. at 1044-1045.
We reviewed our application of the discovery standard to latent injuries and diseases which do not manifest themselves until many years after the alleged act of medical negligence in Williams v. Kilgore, 618 So.2d 51 (Miss. 1992). In that case, a biopsy needle broke in 1964, lodging in the patient's left buttock region. Although Mrs. Williams was reassured by her surgeon that the needle would be removed, and then, that it had been removed, it was not. Despite evidence that some of her many physicians were aware of the needle's continued presence in 1972, and a long history of unexplained lower back pain and infections, Mrs. Williams asserted that she was not aware of the linkage between the needle and her various ailments until she was hospitalized for back problems in 1985. Williams, 618 So.2d at 52. In holding that Williams' 1987 claim was not barred by either § 15-1-36 or § 15-1-49, we analogized her injury other "inherently undiscoverable" injuries. Id. at 53, citing Owens-Illinois v. Edwards, 573 So.2d 704 (Miss. 1990) (extending the discovery rule to Miss. Code Ann. § 15-1-49 in cases of products liability or negligence involving a latent injury or disease). See also Schiro v. American Tobacco Co., 611 So.2d 962 (Miss. 1992) (applying discovery standard in tobacco litigation); Georgia Pacific Corp. v. Taplin, 586 So.2d 823 (Miss. 1991) (applying the discovery rule to latent injuries or diseases in worker's compensation cases); Staheli v. Smith, 548 So.2d 1299 (Miss. 1989) (applying discovery rule to intentional tort of defamation). In Williams, we reaffirmed our holding in Owens-Illinois that:
we laid to rest the old notion that the statute of limitations begins to run at the time an act of negligence occurs, and held that a cause of action must be completed before an action can be commenced and a tort is not completed until an injury occurs.

Williams, 618 So.2d at 54 (emphasis added). Thus, where an injury or disease is latent, a determination of when the statute of limitation begins to run focuses not on the time of the negligent act or omission, but on when the plaintiff discovers the injury or disease. Moreover, knowledge that there exists a casual relationship between the negligent act and the injury or disease complained of is essential because "it is well-established that prescription does not run against one who has neither actual nor constructive notice of facts that would entitle him to bring an action." Id. at 55, citing Ayo v. Johns-Mansville Sales Corp., 771 F.2d 902, 907 (5th Cir.1985).

A. The Wrongful Death Actions

The heirs of infants Jonathan Kevin Sweeney, who died on June 26, 1984, and Brandon Allen Sweeney, who died on April 15, 1986, filed wrongful death claims against Dr. Preston in March 1987. It is well established that an action may be maintained under our wrongful death statute, Miss.Code *335 Ann. § 11-7-13, for infants who die at birth. Terrell v. Rankin, 511 So.2d 126, 127 (Miss. 1987) (wrongful death action could be maintained for stillborn infant); Rainey v. Horn, 221 Miss. 269, 283, 72 So.2d 434 (1954) (wrongful death action can be maintained for fetus "after it reaches the prenatal age of viability ... if such child dies before birth as the result of a negligent act of another"). Thus an action can be maintained for the death of an infant who lived less than forty-eight hours. Applying the discovery standard articulated in Williams v. Kilgore and following our decision in Gentry v. Wallace, 606 So.2d 1117 (Miss. 1992), we further find that these causes of action were still viable pursuant to Miss. Code Ann. § 15-1-36.
In Gentry, we reaffirmed our recognition that wrongful death and medical negligence are two separate and distinct causes of action.[1]Id. at 1119. In that case, Mary Gentry was initially diagnosed with cancer in her right breast in 1981, and underwent a radical mastectomy. After experiencing new symptoms, she was treated by Drs. Wallace and Pittman between September, 1984 and March 1, 1985. She was neither diagnosed nor treated for cancer. Id. at 1118. She sought a second opinion and was advised on March 1, 1985, that she suffered from a metastic breast carcinoma, but that the cancer was too advanced for any meaningful treatment. She died of breast and lung cancer two weeks later. Her son filed a wrongful death action on March 16, 1987, two years and one day after her death. Id. The trial court granted the doctors' motion for summary judgment, finding that the statute of limitations on the wrongful death action had started to run when Mrs. Gentry discovered her doctors' failure to diagnose her condition. However, reversing the circuit court's decision and explaining the error of its logic, we stated:
"[p]rescription does not begin to run against one who is ignorant of facts that would entitle him to bring an action." Ayo v. Johns-Manville Sales Corp., 771 F.2d 902, 906 (5th Cir.1985). The most basic fact a wrongful death plaintiff must know in order to be aware that he is "entitled to bring an action" is that a death has occurred. A physician can engage in the most wretched acts of negligence in plain view of a patient's family, but until the patient dies, the family members cannot know the one indispensable fact that would "entitle them to bring an action." In the wrongful death context, therefore, the "alleged act, omission or neglect" to which § 15-1-36 necessarily refers is lethal conduct. There is no logical way that a potential wrongful death plaintiff can "know or discover" conduct entitling him to sue until the decedent dies.
Id. at 1122.
In Gentry, we rejected the notion that a wrongful death claim accrued when the negligent act was discovered even if was discovered prior to the death of the victim of the doctor's negligence. Id. at 1121. Rather, we found that the statute of limitations was triggered by death, reiterating our holding in Owens that a cause of action does not accrue until an injury occurs. We further found that "under the statute, the limitations period does not begin to run until the heir knows or should reasonably know about the medical negligence which caused the death." Gentry, 606 So.2d at 1119.
When considering an appeal from an order of summary judgment, we consider the evidence in light most favorable to the nonmoving party. Brown v. Credit Center, Inc, 444 So.2d 358, 362 (Miss. 1983). We must, therefore, look at the evidence as it favors the heirs of the Sweeney infants. From the record, it appears that the heirs of Jonathan Kevin Sweeney had no reason to know of the medical negligence that caused his death until nearly a year after he died. There is no evidence that Brenda requested or was asked to request copies of her medical records from Dr. Preston until 1985, nor as we pointed out *336 in Williams, was she obligated to do so. 618 So.2d at 55. Affidavits filed by the Sweeneys reveal only that Brenda was first made aware of her Rh iso-immunization sensitivity during a pregnancy which culminated in the delivery of a healthy infant daughter in 1977 and later advised that there could be "risks" in any future pregnancies. However, a second healthy daughter was born in 1980. Nothing in the affidavits filed by Brenda's physicians suggests either that any of her doctors informed her that her condition could cause the death of an infant, or further, that her iso-immunization sensitivity was caused by Dr. Preston's mistyping of her blood and his failure to administer Rhogram after the 1974 stillbirth. Only in 1985, when Brenda obtained her records, noted that her blood type was incorrectly identified as B positive, and questioned Dr. Preston was a causal link made between his actions in 1973 and the death of Jonathan Kevin Sweeney. Thus, the heirs did not have the facts needed to know that they were "entitled to bring an action" against Dr. Preston for the infant's death until that time. The Sweeney's cause of action for the wrongful death of second infant, Brandon Allen, who was born and subsequently died in April, 1986, falls squarely within the two-year statute of limitations.

B. The Personal Injury Action

Brenda's secondary claim for personal injuries resulting from Dr. Preston's alleged negligence is somewhat more tenuous. As distinguished from the wrongful death claims which accrue at a distinct time and place, the record presents us with conflicting evidence of when the injuries claimed took place. We have recognized that in some instances, the issue of whether a suit is barred by a statute of limitations is a question of fact for a jury to determine. Smith v. Sanders, 485 So.2d 1051, 1053 (Miss. 1986). A cause of action based on any personal injury she may claim arose not when the alleged acts of negligence occurred, but when she discovered or reasonably should have discovered the acts or omissions and their relationship to the injury sustained. Williams, 618 So.2d at 54. Thus, summary judgment was not appropriate. Only when these issues have been resolved by a jury can it be determined whether her cause of action is still viable.

III.
The wrongful death actions against Dr. Preston did not accrue until the deaths of Jonathan Kevin Sweeney and Brandon Allen Sweeney and the heirs discovered the cause of those deaths. The actions were timely filed within the applicable statute of limitations. Thus, summary judgment was not appropriate. The viability of Brenda Sweeney's personal injury claim against Dr. Preston is governed by the discovery standard. Questions of material fact, properly within the province of the jury, govern this issue. Accordingly, we reverse and remand this case for proceedings consistent with this opinion.
REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
DAN M. LEE, P.J., and SULLIVAN, PITTMAN and JAMES L. ROBERTS, JR., JJ., concur.
HAWKINS, C.J., dissents with separate written opinion joined by PRATHER, P.J., and BANKS and SMITH, JJ.
HAWKINS, Chief Justice, dissenting:
Brenda Joyce Sweeney, her husband Kevin, and their two minor children have appealed a summary judgment dismissal of their malpractice complaint against W.H. Preston, M.D. Under the facts of this case I would hold that Mrs. and Mr. Sweeney's claim is barred by Miss. Code Ann. § 15-1-36, and that the children have no cause of action under the wrongful death statute Miss. Code Ann. § 11-7-13, and affirm.
On March 24, 1987, Brenda and her husband, Kevin, together with their two minor children, Brendi Lashawn and Bronzi Shannon, filed a malpractice complaint in the circuit court of Prentiss County against W.H. Preston, M.D., alleging negligent medical treatment.
In November 1973 Brenda was a patient of Dr. Preston's being treated for pregnancy. At some time during his treatment, her blood *337 was mistyped B +, she actually having B - blood type. The record in this case does not state who made the blood test, but Dr. Preston in his affidavit did not deny that his office made the blood test. On July 25, 1974, with Dr. Preston her physician, Brenda delivered a stillborn baby which, according to Dr. Preston, had been dead at least seven days at the time of delivery, and no blood was available from it.
In 1974, it was good medical practice for Rh-negative mothers who gave birth to Rh-positive babies to be administered a drug, Rhogam, by injection within 72 hours of birth. This therapy was to help prevent the Rh-negative mother from becoming "sensitized" by her exposure to the Rh-positive blood of the newborn child. Following a lapse of 72 hours, injection of Rhogam was of no benefit.
Brenda continued as Dr. Preston's patient, and on March 21, 1976, she had a spontaneous abortion, following which Dr. Preston performed a D and C (dilation and curettage). No Rhogam was administered then, either. The last time Dr. Preston saw Brenda as a patient was July 23, 1977.
In 1976 the Sweeneys moved to Starkville, and that summer Brenda again became pregnant. Her physician was John T. Copeland, M.D. She first saw Dr. Copeland on September 15, 1976, and gave him a history of having aborted several months previously and having given birth in 1974 to a stillborn baby. Dr. Copeland received a report from the Columbus Pathology Laboratory on October 3, 1976, that Brenda's blood type was B-.
On April 10, 1977, Brenda delivered Brendi, a healthy baby girl whose blood type was A +. Dr. Copeland learned that Brenda had previously become sensitized, and because antibodies were already present, he did not administer Rhogam. In April 1977 according to Dr. Copeland's affidavit, he "discussed this with Mrs. Sweeney and informed her of the possibility and potentiality of difficulties with future deliveries and that she should inform whoever she goes to of her Rh-negativity."
In her deposition Brenda related the discussion she and Kevin had with Dr. Copeland about this matter:
Q. Okay. Did you have any discussions with Dr. Copeland about your blood type either during the course of or subsequent to the birth of Brendi?
A. Yes, he told me shortly before I had her that I had negative blood.
Q. Okay. Did he give you any warnings or did he give you any instructions because of the negative blood?
A. No, he said he had to give me a shot after I had the baby.
Q. Okay. Did he give you the shot?
A. No, no, sir, he said he couldn't give me the shot because I had already been insensitized or something, I can't  the word he used, I can't remember, but he couldn't give me the shot.
Q. Did he tell you that the shot needed to be given right after the birth?
A. He said  yes, and he said it  it needed to be given and to tell my next doctor that I didn't get the shot.
Q. Well, now, where  this was in his office or was this at the hospital?
A. This was at the hospital he said this.
Q. Okay. Was there anyone else present when you had this conversation?
A. Yes, sir, my husband.
Q. Okay. Were there any nurses or anybody 
A. No, sir.
Q. Well, were you a bit surprised to find out that you were negative and 
A. No, sir, I had no idea what he was talking about.
Q. Okay.
A. I asked him does this mean I can't have any more children and he said, "No, not at all, just tell your next doctor you didn't get the shot."
Q. When did you not get the shot?
A. He told us that I should have got it with my first pregnancy.
Q. And the shot is supposed to have then eliminated some of these problems?
A. Yes, sir.

*338 Q. And now the first pregnancy, that wouldn't be the miscarriage in '76, that would be the stillborn in '74 
A. That's right.
Q.  that Dr. Preston 
A. Yes, sir.
Q.  was involved in? And he said that since  that's when you should have the shot?
A. Yes.
(R.20-22)
Dr. Copeland did not see Brenda following May 1977. Her next physician was Swam B. Burrus, M.D., whom she saw in Tupelo for pregnancy in December 1979. At that time she related to him a history of having given birth to the stillborn child in 1974 and the spontaneous abortion in 1976, and also that she had delivered a healthy female baby on April 10, 1977, in Starkville. She told him that no Rhogam was given her following the 1977 birth. Dr. Burrus found Brenda had blood type B-. On January 4, 1980, Brenda delivered Bronzi, a healthy baby girl, who had type O+ blood. According to Dr. Burrus's affidavit:
I had a discussion with her concerning the increased risk of problem with Rh incompatibility with another pregnancy but she would not say that she would avoid future pregnancies. I discussed the possibility of sterilization with the patient and the severity of her problem, however she did not want sterilization and refused that procedure.
... .
I discussed at length the Rh incompatibility problem with Ms. Sweeney as the reason for sterilization, however, she was reluctant and refused that procedure.
(R.14)
Dr. Burrus continued as her physician, and on June 26, 1984, he performed a Cesarean section and she delivered a baby boy who died within forty-eight hours. His name was Jonathan Kevin.
Dr. Burrus subsequently referred Brenda to John B. Dacus, M.D., a Memphis physician specialist.
According to Brenda's deposition, she and Dr. Burrus discussed in 1980 the possibility of sterilization, but she did not want to because she wanted to have another baby. (R.27) He told her "that there could be problems because I didn't get the shot they could have to, you know, do some tests and stuff and I had already discussed with him that I didn't want to be  I didn't want to have my tubes tied, so he didn't discuss it with me at all a lot, not at all, no."
Also, according to Brenda, Dr. Burrus did not tell her she should have got the shot in 1974, and that Dr. Copeland was the only one who had told her that. (R.30)
Brenda also deposed that following the birth in 1984 of the baby boy she recalled Dr. Burrus telling her that she needed "to get my tubes tied, to come back later and get them tied. At that time I was so let down and upset that I could think in terms of doing something permanent not to ever try to have another baby."
Brenda delivered a baby boy in a Memphis hospital on April 15, 1986, under the care of Dr. Dacus. The child, named Brandon Allen, lived two days.
The complaint was based upon the alleged mistyping of Brenda's blood as B + by Dr. Preston, and his negligent failure to administer Rhogam to her immediately following the stillborn delivery on July 25, 1974. The complaint alleged damages for personal injury to Brenda, and for the wrongful deaths of Jonathan Kevin, born June 26, 1984, and Brandon Allen, born April 15, 1986.
Dr. Preston pled the statute of limitations, and following the deposition of Brenda, moved for summary judgment. The circuit judge rendered a written opinion on December 10, 1990, finding that Miss. Code Ann. § 15-1-36 barred her claim, and entered a judgment dismissing the complaint.

LAW
There are two issues presented on this appeal, namely: whether Brenda's and Kevin's complaint is barred by the statute of limitations, and second, whether their two minor children have a cause of action under the wrongful death statute for the deaths of *339 their infant brothers. For the reasons stated I would hold that Brenda's and Kevin's cause of action is time barred, and that their two minor children Brendi Lashawn and Bronzi Shannon have no cause of action under the wrongful death statute, Miss. Code Ann. § 11-7-13, for the deaths of Jonathan Kevin, who lived less than 48 hours from date of birth June 26, 1984, or Brandon Allen, who lived two days from date of birth April 16, 1986.
When Brenda first when to Dr. Copeland in September 1976 she gave him a history of having given birth to the stillborn baby in 1974 and the miscarriage six months previously. This alerted him to the fact that he had a patient who had experienced difficulties in childbirth beyond that of the average mother. Brenda also had to be distressingly aware that she was a woman who had serious problems giving birth to a healthy baby.
Despite this, she very much wanted to have children.
What did Brenda learn from Dr. Copeland in 1977?
The pathology laboratory report of October 3, 1976, informed Dr. Copeland that Brenda had B - blood. According to her deposition, he told her shortly before the birth of Brendi that she had "negative blood," and he would have to give her "a shot after I had the baby."
He did not give her a shot, however. Why? "[H]e said he couldn't give me the shot because I had already been insensitized or something, I can't  the word he used, I can't remember, but he couldn't give me the shot." Again, according to her deposition, he told her that the shot should have been given with her first pregnancy in 1974 when Dr. Preston was her physician. He also told her to tell her next physician that she had not been given a Rhogam shot. Finally, she deposed that Dr. Copeland told her that the shot was "supposed to have eliminated some of these problems."
Thus, according to Brenda's own deposition, she was told in 1977 that because she had "negative blood" she needed to get a shot of some drug following the birth of her baby. Following the birth of her baby, however, she was told by Dr. Copeland that he was not going to give her a shot, because it would do her no good. It should have been given following the stillborn birth in 1974 by Dr. Preston, and that the purpose of the shot was to eliminate some of her childbirth problems, which were quite serious.
Thereafter, in 1980, Brenda had a discussion with Dr. Burrus about the possibility of sterilization, he telling her that there could be problems because she did not get the shot of Rhogam. Following the 1984 delivery, Dr. Burrus told her she needed "to get my tubes tied," but she still could not "think in terms of doing something permanently not to ever try to have another baby."
Brenda certainly knew in 1977 that she was having serious problems in childbirth. She learned that there was a drug which should be administered to help relieve some of her problems with childbirth. Then she learned that Dr. Copeland was not going to give her the drug because it would do her no good, it should have been given right after the stillborn delivery in 1974.
Brenda was put on notice not simply of facts from which she could have by reasonable diligence have ascertained that Dr. Preston failed to administer a drug to relieve her of childbirth problems, she was put on notice of actual facts that told her she should have had the drug administered in her 1974 pregnancy by Dr. Preston, and she knew of course that he had failed to do so.
Section 15-1-36(1) of the Mississippi Code Annotated (Supp. 1976) provides that "no claim in tort may be brought against a licensed physician ... for injuries or wrongful death arising out of the course of medical ... services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered." Subsection (8) of the statute states: "The limitation established by this section as to a licensed physician... shall apply only to actions the cause of which accrued on or after July 1, 1976."[1]
*340 Under Miss. Code Ann. § 15-1-36(1), Brenda's cause of action accrued against Dr. Preston on the date she either in fact did learn, or was supplied sufficient information from which she might have known or discovered that Dr. Preston had failed to do some act which could have alleviated her problems with delivering a healthy baby. Kilgore v. Barnes, 508 So.2d 1042, 1045 (Miss. 1987); Tribou v. Gunn, 410 So.2d 378 (Miss. 1982). "[T]he focus is rather upon when the plaintiff discovers the injury by the exercise of reasonable care and diligence." Pittman v. Hodges, 462 So.2d 330, 332 (Miss. 1984). Thus, in April 1977 her cause of action accrued against Dr. Preston, because it was in the period of April 10-13, 1977, that she was informed she was not going to be given the expected injection, and the reason why not. To have done her any good, it should have been administered in 1974 by Dr. Preston.
According to her complaint, Brenda was injured by Dr. Preston by his failure to administer Rhogam to her no later than July 27, 1974. In Smith v. Sanders, 485 So.2d 1051 (Miss. 1986), we held:
The two-year statute of limitations does not commence running until the patient discovers or should have discovered that he has a cause of action. Pittman v. Hodges, 462 So.2d 330 (Miss. 1984). The focus is upon the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury. The operative time is when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner.
... .
Only when the patient discovered, or should have discovered with reasonable diligence, that he had been injured or damaged because of the failure to resect did he have sufficient knowledge to be aware of the fact that he had a cause of action.
Id. at 1052-54.
It would be difficult to give a better hypothetical example of the accrual of a cause of action, absent a doctor telling his patient her previous physician was guilty of malpractice, than what Brenda was told by Dr. Copeland in April 1977. True, she did not learn in April 1977 the precise reason Dr. Preston had failed to give her a shot. Nor was this required for her cause of action to accrue, because she clearly learned at that time that (1) she had been injured in her physical ability to deliver a healthy baby; (2) the cause of this injury; and (3) the "causative relationship" between her impaired child-bearing ability and the "conduct" of Dr. Preston. Smith v. Sanders, 485 So.2d at 1052.
Nor does Miss. Code Ann. § 15-1-49 (Supp. 1993), a general six-year statute of limitations in effect in 1974, and covering malpractice actions, benefit Brenda. Until the recent case of Williams v. Kilgore, 618 So.2d 51 (Miss. 1993) (Banks, J., specially concurring joined by Pittman, J.; Hawkins, P.J., dissenting joined by Roy Noble Lee, C.J.), this Court had consistently held that the cause of action for malpractice accrued on the date of the commission of the negligent act, and not from date of its discovery. Kilgore v. Barnes, 508 So.2d 1042, 1044 (Miss. 1987); Smith v. McComb Infirmary Assoc., 196 So.2d 91, 92-3 (Miss. 1967); Ross v. Hodges, 234 So.2d 905 (Miss. 1970); Wilder v. St. Joseph Hospital, 225 Miss. 42, 45-6, 82 So.2d 651, 652 (1955). Under these holdings, Brenda's claim would have expired July 25, 1980, six years following July 24, 1974. In Williams v. Kilgore, we changed the rule as to the accrual of a malpractice claim and held *341 that under Miss. Code Ann. § 15-1-49 a malpractice action could be instituted at any time within six years from date of discovery. Even with this liberality of construction of Williams v. Kilgore, however, Brenda's claim was barred July 25, 1983, several years prior to her filing of her complaint on March 24, 1987.[2]
For these reasons I would hold that Brenda's and Kevin's complaint for malpractice upon her is time barred.

IS THERE A WRONGFUL DEATH CAUSE OF ACTION?
Mr. and Mrs. Sweeney had to be acutely aware beginning in 1974 that she had serious problems giving birth to a healthy child. On July 25, 1974, she delivered a stillborn baby, and on March 21, 1976, she had a spontaneous abortion. Dr. Preston's alleged act of negligence occurred in July 1974 added to a disorder she already had. In April 1977 Mr. and Mrs. Sweeney were advised by another physician, Dr. Copeland, of Dr. Preston's negligence and the problem it created.
In 1980 still another physician, Dr. Burrus, told her the serious risk and danger of having any more children, and advised sterilization. The Sweeneys ignored his advice. They chose for her to become pregnant, and as a result on June 26, 1984, she delivered a child who lived two days.
Despite this tragedy, they again chose for her to become pregnant, and on April 15, 1986, while under the care of still another physician, Dr. Dacus, she delivered a child who lived two days.
On March 24, 1987, thirteen years after the negligent act of Dr. Preston, and ten years after the Sweeneys were notified of it, they sued Dr. Preston for malpractice. Dr. Preston's negligent act, if it occurred, was a single act. After he and the Sweeneys learned of it, there was nothing further Dr. Preston could do except warn. Warning they had. He could not prevent further harm, further injury. That decision was solely for the Sweeneys. They chose the most terrible danger of all, bringing into a life a human being who had little chance of living, and if so, could go through whatever life it had deformed and maimed. That decision was peculiarly one which only the Sweeneys could make, and Dr. Preston should not be held accountable for its consequences.
There can be no doubt that uppermost in the minds of any couple who want to have a child is the desire that it be born healthy. When informed of the hazard in their particular case, the heartache, misery and pain in bringing into life a child who shortly dies, or is doomed to deformity or catastrophic disability, it was the Sweeneys, and they alone, to make the choice of whether to conceive or not, one which they and they alone should make, and for which they and they alone should be responsible.
The majority not only holds Dr. Preston responsible for these two tragic deaths, but tells the Sweeneys they will have a cause of action for every child the Sweeneys attempt in the future who dies shortly after birth, or who is born maimed and deformed.
Instead of worrying about his patients when he lies down to sleep at night, Dr. Preston can look forward to the very good chance of being a court defendant the remainder of his life. With this burden it will take a very soft pillow to give him much sleep. It would be far better if physicians in small towns could spend their time worrying about their patients than lawsuits such as the majority today authorizes.
Dr. Preston could not prevent Mrs. Sweeney from becoming pregnant. Only she could make that decision.
In centuries of struggle to safeguard a free, independent and civilized society, courts have erected and adhered to two basic concepts, personal accountability and personal *342 responsibility. Puckett v. Rufenacht, Bromagen & Hertz, 587 So.2d 273, 278 (Miss. 1991).
The law has always set boundaries beyond which personal accountability will not extend. Borer v. American Airlines, Inc. 19 Cal.3d 441, 446-47, 138 Cal. Rptr. 302, 563 P.2d 858 (1979). Even a person who commits a criminal act, once he has paid his "debt" to society, is punished no further in court.
The law has also always recognized that rational people with full knowledge of the hazards entailed who choose to engage in dangerous undertaking must assume personal responsibility therefor.
The majority and all the authorities it cites ignore these basics. Dr. Preston's accountability is unlimited, the Sweeneys assume no personal responsibility. Volenti non fit injuria, "he who consents cannot receive an injury," 65A C.J.S. Negligence § 174(2), is ignored by the majority.
The evidence before the circuit court in granting summary judgment was that the Sweeneys deliberately chose for Mrs. Sweeney to become pregnant, it was not an accident. Dr. Preston's negligence, at most, contributed to a certain physical condition in Mrs. Sweeney further impairing her ability to bear a healthy child. It took a deliberate choice followed by a deliberate action by the Sweeneys, however, to produce the harm in this case. If this did not constitute an independent intervening cause, one cannot be envisioned.
In City Lines v. Bullock, 194 Miss. 630, 639-40, 13 So.2d 34, 36, 145 A.L.R. 119 (1943), this Court held:
Although one may be negligent, yet if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a nonactionable cause. Negligence which merely furnished the condition or occasion upon which injuries are received but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof. The question is, did the facts constitute a succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the alleged wrong and the injury? 38 Am.Jur., p. 702; Thompson v. Mississippi Cent. R. Co., 175 Miss. 547, 554, 166 So. 353. And so say all the authorities, among which, as a striking illustration, is Bufkin v. Louisville & N.R. Co., 161 Miss. 594, 137 So. 517. (Emphasis added)
This principle was followed in Hoke v. W.L. Holcombe & Assoc., Inc., 186 So.2d 474 (Miss. 1966); Saucier v. Walker, 203 So.2d 299 (Miss. 1967); Stewart v. Kroger Grocery, 198 Miss. 371, 21 So.2d 912 (1945); E.I. DuPont de Nemours & Co. v. Ladner, 221 Miss. 378, 73 So.2d 249 (1954); Permenter v. Milner Chevrolet Co., 229 Miss. 385, 91 So.2d 243 (1956). Nor is M & M Pipe & Pres. Vessel Fab. v. Roberts, 531 So.2d 615 (1988), contrary to this holding. In that case the negligence of the pipe company's driver on the highway was immediately followed by negligence of a car following in reaction to the first act of negligence, and which could have been reasonably anticipated by the former. The children born in this case resulted solely from the deliberate choice of Mr. and Mrs. Sweeney for her to become pregnant after clear warning from her physician of the danger this entailed. E.I. DuPont de Nemours & Co. v. Ladner, supra.
There is an invidious treatment by the majority of the medical profession as opposed to any other. Suppose a lawyer gave an erroneous certificate of title, which is caught before injury, and the recipient warned not to act on it. Then, disregarding the warning, a parent invests his child's money in property with a defective title. Would we hold the erring lawyer liable?
Suppose an architect draws defective plans discovered before any building is erected. Then, after being fully warned the plans are defective and should not be followed  indeed dangerous to follow  the warning is totally disregarded by an owner who builds according to the defective plans. Would we hold the architect liable if a subsequently born child of the owner was injured or killed because *343 of the collapse of the building? See also Touche Ross v. Commercial Union Ins., 514 So.2d 315 (Miss. 1987) (applying doctrine of independent intervening case to accountants).
In facts more favorable to plaintiffs than the instant case, in other jurisdictions where a subsequently conceived child has sought to bring an action for injuries to or negligent treatment of his mother prior to his conception, the courts have declined to impose liability upon the tort feasor, the treating physician or medical facility. Hegyes v. Unjian Enterprises, Inc., 286 Cal. Rptr. 85, 234 Cal. App.3rd 1103 (1992); Albala v. City of New York, 54 N.Y.2d 269, 445 N.Y.S.2d 108, 429 N.E.2d 786 (1981); Enright v. Eli Lilly & Co., 77 N.Y.2d 377, 568 N.Y.S.2d 550, 570 N.E.2d 198 (1991); McAuley v. Wills, 251 Ga. 3, 303 S.E.2d 258 (1983).
Clearly here, where the Sweeneys were warned of the danger of having children, Dr. Preston should not be held accountable for the result.

WRONGFUL DEATH STATUTE
In addition to all which has been stated above, this is not simply a case of a deformed child suing for preconception treatment of his mother, but siblings for the wrongful death of a subsequently born child.
Mississippi Code Annotated § 11-7-13, the wrongful death statute, is a statutorily-created right nonexistent at common law, and we have consistently held it should be strictly construed. Smith v. Garrett, 287 So.2d 258 (Miss. 1973); Boroughs v. Oliver, 217 Miss. 280, 64 So.2d 338 (1953); Hasson Gro. Co. v. Cook, 196 Miss. 452, 17 So.2d 791 (1944); Edwards v. Sears, Roebuck and Co., 512 F.2d 276 (1975).
I cannot believe the Legislature ever intended to create a wrongful death cause of action in a case such as this. Today's victory for these plaintiffs is pyrrhic for future malpractice plaintiffs, because the majority's opinion will be Exhibit A for those lobbying to emasculate medical malpractice actions.

THE ANOMALY
What, we might ask, does the majority propose to do about the ethical dilemma in which the attorney for the Sweeneys now finds himself? The surviving children now have a wrongful death cause of action not only against Dr. Preston, but their parents as well who, after all, are 99.9999% responsible for the birth of their short-lived siblings. Should he argue that Glaskox by and through Denton v. Glaskox, 614 So.2d 906 (Miss. 1992), be extended the minute distance to create liability against them as well?
Shall counsel ask that the children be permitted to sue their parents as well? Who will he represent? Will the surviving children require separate counsel?
If Dr. Preston through a third-party action under Rule 14 Miss.R.Civ.Prac. and Miss. Code Ann. § 85-5-7 (Supp. 1993) seeks to hold the parents liable, what is the obligation of counsel?
It is hard to say whether the majority has created a Gordian knot, a Chinese puzzle or a Rube Goldberg contraption.

CONCLUSION
In sum, Mr. and Mrs. Sweeney stated a cause of action against Dr. Preston for injuries done her, but this claim is barred by the statutes of limitation, both Miss. Code Ann. §§ 15-1-36 and 15-1-49 (Supp. 1993). There should be no wrongful death claim against Dr. Preston.
I would affirm, and accordingly I dissent.
PRATHER, P.J., and BANKS and SMITH, JJ., join this opinion.
NOTES
[1] In Smith v. McComb Infirmary Association, 196 So.2d 91 (Miss. 1967), we likewise held that a medical negligence or malpractice claim is separate and distinct from a wrongful death claim. As in the case sub judice, an infant died from Rh factor complications after its mother's blood had been mistyped. We held that the statute of limitations on the wrongful death action began to run on the date of the infant's death in 1964, not from the date the mother's blood was mistyped in 1958.
[1] Miss. Code Ann. § 15-1-36(1) and (8) read in full:

(1) Except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.
.....
(8) The limitation established by this section as to a licensed physician, osteopath, dentist, hospital or nurse shall apply only to actions the cause of which accrued on or after July 1, 1976.
(Emphasis added.)
[2] The circuit court held that Miss. Code Ann. § 15-1-36, enacted in 1976, did not apply to this case because it operated to shorten Miss. Code Ann. § 15-1-49, a general six-year statute of limitation in effect in July, 1974, when Dr. Preston failed to administer the shot of Rhogam. Kilgore v. Barnes, 508 So.2d 1042 (Miss. 1987). In Kilgore this Court reaffirmed our previous holding that under Miss. Code Ann. § 15-1-49 a malpractice action had to be brought within six years of the date of injury, not a discovery. The circuit court went on to hold that under Miss. Code Ann. § 15-1-49 Brenda's claim was barred July 24, 1980.