*949
 
 MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Peavey Electronics Corporation brought suit against Baan U.S.A., Inc., seeking millions of dollars in damages for software and software support it alleges were defective. Peavey sought to recover under two theories, one based on tort and the other on breach of contract and warranty. At issue on appeal are two summary judgment motions granted in favor of Baan; the trial court entered summary judgment for Baan after dismissing Peav-ey’s tort and services contract claims on the statute of limitations and dismissing Peavey’s contract and warranty claims on the sale of goods as waived by a subsequent contract. Peavey also asserts that the trial court abused its discretion in denying two motions to compel discovery. After a thorough review of the record and the governing law, we affirm the trial court’s judgment.
 

 FACTS
 

 ¶ 2. Peavey sought to purchase an “ERP” (enterprise resource planning) computer system, which consists of a suite of interconnected software programs. It ultimately selected Baan’s eponymous “BAAN ERP” (“BAAN” or “the BAAN software”), which consists of software programs and computer systems that work together to direct and coordinate the operations of a business, such as ordering, manufacturing, and shipping. Peavey wanted the software for a number of reasons, including to modernize its computer systems, streamline its operations, lower its costs, and make its operation “Y2k compliant.”
 

 ¶ 3. The BAAN software does not work “out of the box,” but requires significant work to implement at a business. Peavey considered two approaches to implementing the BAAN software; it could either adapt its operations to fit within the software’s limits, or it could customize the software to better suit Peavey’s preexisting systems and practices. Peavey chose the latter option, and its staff and third-party consultants undertook extensive customizations to the BAAN software. Peav-ey also took the somewhat unusual step of licensing the BAAN software’s “source code,” the underlying, human-readable language of computer programs, to secure its investment if Baan ceased supporting the BAAN software in the future. Peavey’s customizations included extensive changes to the source code of the BAAN software.
 

 ¶ 4. In addition to licensing the software, Peavey also contracted for Baan’s consultants to assist Peavey in implementing the software. Detailed contracts — styled the Software License Agreement and Services Agreement — for the BAAN software and consulting services, respectively, were executed on October 31,1997.
 

 ¶ 5. Fearing the complexity of the project and hoping to minimize its risk, Peav-ey planned to implement the BAAN software in two phases. The first, “Phase I,” would “go live” with the sales and distribution portions of the BAAN software, along with Peavey’s customizations and interfaces to its preexisting computer systems. “Phase II” would be completed later, implementing the remainder of the BAAN software, including the manufacturing and “SCS” modules.
 
 [1]
 

 ¶ 6. The “go live” occurred on July 6, 1999, and was by all accounts an immense and expensive failure. In addition to the
 
 *950
 
 work needed to fix the computer systems, Peavey was also late in shipping orders, and it had to do many tasks manually that had previously been automated. Following the failed “go live,” Peavey suspended work on implementing Phase II. All of Baan’s consultants operating under the Services Agreement left Peavey in October 1999.
 

 ¶ 7. Having worked out its issues with much of the BAAN software implemented during Phase I, Peavey continued to use it, but it never resumed implementation of Phase II. On June 20, 2003, Peavey and Baan negotiated a reduction in the licensing and maintenance fees for the BAAN software, commensurate with what was actually being used at Peavey. This was significantly less than had been planned when the original contracts were signed in 1997.
 

 ¶ 8. Peavey filed suit against Baan on February 27, 2004, asserting numerous causes of action. Following what the trial court described as an “all out war” of litigation, it dismissed Peavey’s tort claims as barred by the statute of limitations. The trial court subsequently dismissed Peavey’s contract and warranty claims based on the Software Agreement as waived by subsequent contract, and it dismissed Peavey’s contract and warranty claims under the Services Agreement as barred by the statute of limitations. The trial court then entered summary judgment for Baan, and Peavey appeals, asserting numerous errors.
 

 DISCUSSION
 

 1. Whether the trial court erred in granting summary judgment on Peavey’s tort claims.
 

 ¶ 9. Peavey’s complaint alleged counts of fraud, fraudulent misrepresentation, negligent misrepresentation, money had and received, and breach of the duty of good faith and fair dealing. The trial court dismissed these tort claims as barred by the statute of limitations. On appeal, Peavey acknowledges that its tort claims are subject to the three-year statute of limitations provided in Mississippi Code Annotated section 15-1-49 (Rev.2003) and that, absent tolling, the statute has run on its tort claims. Peavey filed suit on February 27, 2004; thus, it must be able to show that the statute did not begin to run until at least February 27, 2001. Peavey argues that there are four bases for tolling the statute of limitations: the discovery rule, equitable estoppel, continuing tort doctrine, and fraudulent concealment. We shall address each basis individually.
 

 A. The Discovery Ride
 

 ¶ 10. The “discovery rule” operates to toll the statute of limitations until “a plaintiff ‘should have reasonably known of some negligent conduct, even if the plaintiff does not know with absolute certainty that the conduct was legally negligent.’ ”
 
 Boyles v. Schlumberger Tech. Corp.,
 
 832 So.2d 503, 506(¶ 6) (Miss.2002) (quoting
 
 Sarris v. Smith,
 
 782 So.2d 721, 725(1113) (Miss.2001)). The statute of limitations begins to run “when the [plaintiff] can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the [defendant].”
 
 Sarris,
 
 782 So.2d at 723(¶ 9) (quoting
 
 Smith v. Sanders,
 
 485 So.2d 1051, 1052 (Miss.1986)). In applying the discovery rule to cases such as this, the supreme coui't has stated:
 

 The discovery rule’s application has been greatly expanded over time.
 
 See Barnes v. Singing River Hosp. Sys.,
 
 733 So.2d 199 (Miss.1999) (Mississippi Tort Claims Act);
 
 Georgia Pacific Corp. v. Taplin,
 
 586 So.2d 823 (Miss.1991) (workers compensation);
 
 Staheli v. Smith,
 
 548
 
 *951
 
 So.2d 1299 (Miss.1989) (defamation). At issue in all cases however, is when the plaintiff discovers their [sic] injury or disease.
 
 Sweeney v. Preston,
 
 642 So.2d 332, 334 (Miss.1994) (quoting
 
 Williams v. Kilgore,
 
 618 So.2d 51, 55 (Miss.1992)). In
 
 Sweeney
 
 this Court noted that, “knowledge that there exists a causal relationship between the negligent act and the injury or disease complained of
 
 is essential
 
 because ‘it is well-established that prescription does not run against one who has neither actual nor constructive notice of the facts that would entitle him to bring an action.’ ”
 
 Id.
 
 (emphasis added). Whether the plaintiff knew about the injury has typically been reserved as a jury question.
 
 Barnes,
 
 733 So.2d at 205;
 
 [Owens-Illinois, Inc. v.] Edwards,
 
 573 So.2d [704,] 709 [Miss. 1990].
 

 PPG Architectural Finishes, Inc. v. Lowery,
 
 909 So.2d 47, 50(¶ 10) (Miss.2005).
 

 ¶ 11. The supreme court has also “cautioned that the discovery rule should only be applied in ‘limited circumstances in [ ] negligence and products liability cases involving latent injury.’ ”
 
 Id,.
 
 at (¶ 11) (quoting
 
 Schiro v. Am. Tobacco Co.,
 
 611 So.2d 962, 964 (Miss.1992);
 
 Edwards,
 
 573 So.2d at 707).
 
 See also
 
 54 C.J.S.
 
 Limitations of Actions
 
 § 166 (2005) (“[A] plaintiff cannot be permitted to wait until he or she knows all of the injurious effects as consequences of an actionable wrong.... [Ajccrual occurs upon notice of the injury, although the claimant does not yet know the full extent of the damages or the chances of avoiding them.”) (footnotes omitted). Without a latent injury, the discovery rule cannot apply.
 
 Lowery,
 
 909 So.2d at 50(¶ 11) (citing
 
 Chamberlin v. City of Hernando,
 
 716 So.2d 596, 601 (¶ 18) (Miss.1998)). Latent injury “is defined as one where the plaintiff will be precluded from discovering harm or injury because of the secretive or inherently undiscovera-ble nature of the wrongdoing in question ... [or] when it is unrealistic to expect a layman to perceive the injury at the time of the wrongful act.”
 
 Id.
 
 at 50(¶ 12) (internal quotations omitted). To be latent, an injury “must be undiscoverable by reasonable methods.”
 
 Id.
 
 at 51(¶ 14). “[T]o claim benefit of the discovery rule, a plaintiff must be reasonably diligent in investigating the circumstances surrounding the injury. The focus is on the time that the patient discovers, or should have discovered by the exercise of reasonable diligence, that he probably has an actionable injury.”
 
 Wayne Gen. Hosp. v. Hayes,
 
 868 So.2d 997, 1001(¶ 15) (Miss.2004) (citations and internal quotations omitted).
 

 ¶ 12. On appeal, Peavey asserts that the trial court misunderstood the nature of its injury. It argues that “[Peav-e/s injury] is that the software package Baan sold and agreed to implement could not be installed to function in an integrated manner because, as Peavey eventually discovered, the SCS component of the package either did not exist or was incompatible with the remaining components.”
 
 [2]
 

 
 *952
 
 ¶ 13. We find this argument to be disingenuous at best. It is apparent from our review of the record that, by its own admission, Peavey became aware of compatibility problems with SCS early on. Peav-ey’s expert summarized the evidence as follows:
 

 By March [1999], Peavey became aware that Baan was furiously trying to fix bugs in the integration of SCS and [the BAAN software], moving from [the BAAN software version] IV.0c2 on to 3 and 4 in two separate Baan product development teams. Certainly what was being attempted at Peavey’s site was not functioning.
 

 Additionally, the record reflects that Peav-ey was aware of a purported workaround to the compatibility issues, called a “flat file exchange.” While Peavey maintains that the flat file exchange would not amount to the “full integration” it expected, this nonetheless evidences awareness of the compatibility issues between SCS and the BAAN software. Finally, in addressing Baan’s allegation that Peavey decided not to proceed with “Phase II” as a result of its own internal decisions,
 
 [3]
 
 Peav-ey argues that it paused the implementation in part because of the unavailability of SCS integration, further evidencing Peav-ey’s awareness of the problems.
 

 ¶ 14. In arguing other issues, Peavey states that, although it may have known of the problems with SCS and version IVc2 of the BAAN software in 1999, it did not know that the two were “fundamentally incompatible” and that SCS could
 
 never
 
 be “fully implemented” on version IVc2 of the BAAN software. Peavey argues that this is “evident from Baan’s internal communications.” We find this assertion, however, to not only defy common sense, but to be unsupported by the record. Instead, the only conclusion that is supported by the documents Peavey cites is that Baan never did actually resolve the issues between version IVc2 of the BAAN software and the “full suite of SCS applications.” Nowhere did Baan admit or even imply that this task could never be accomplished, as Peavey argues. Even if this were the case, Peavey has not shown why it could not, through reasonable diligence, have discovered this “fundamental” incompatibility once it became aware of problems in March 1999. Furthermore, Peavey’s argument fails on a more basic level — the issue is when Peavey discovered or reasonably should have discovered its injury, not when it became fully aware of the extent of the injury. It is undisputed that Peavey was aware of th'e injury it alleges in March 1999. The trial court did not err in finding this argument meritless.
 

 B. Fraudulent Concealment
 

 ¶ 15. Where a plaintiff alleges fraudulent concealment, Mississippi Code Annotated section 15-1-67 (Rev.2003) is applicable. It states:
 

 
 *953
 
 If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.
 

 The supreme court has held that fraudulent concealment requires “some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim.”
 
 Stephens v. Equitable Life Assurance Soc’y,
 
 850 So.2d 78, 83-84(¶ 18) (Miss.2003) (quoting
 
 Reich v. Jesco, Inc.,
 
 526 So.2d 550, 552 (Miss.1988)). To toll the statute of limitations, Peavey must offer proof: “(1) that [Baan] engaged in affirmative acts of concealment, and (2) despite investigating with due diligence, [Peavey] was unable to discover the claim.”
 
 Nygaard v. Getty Oil Co.,
 
 918 So.2d 1237, 1242(¶ 22) (Miss.2005). Furthermore, “In order to comply with [Mississippi Rule of Civil Procedure 56(e) ] and succeed on a claim of fraudulent concealment [Peavey] must allege with specificity that [Baan] engaged in affirmative acts of concealment.”
 
 Id.
 
 at (¶ 25).
 

 ¶ 16. Peavey alleges that Baan “tried to conceal the integration problems by blaming Peavey for customizing the software, and by trying to convince Peavey to upgrade to a newer version of the software.” What Peavey fails to demonstrate is how this alleged conduct could and did prevent Peavey from discovering its claim. Peavey is no layman consumer; it is a large corporation with a sophisticated IT staff and extensive resources at its disposal. The record reflects that Peavey had access to all of the relevant software at the time of the “go live” in 1999. Following the failed “go live,” Peavey hired Ken Kan-tor, an expert in the field, to conduct an audit of the ERP project. Kantor completed his audit by June 12, 2000, and ultimately concluded that “[t]he Baan software did not directly cause most of the problems” and “[t]hese problems are of our own making. They are not inherent in Baan.” While Kantor’s report does attribute Peavey’s problems to its own customizations, as Baan has also maintained, there is no evidence that Kantor relied on any representations by Baan. Instead, it is clear that Kantor’s conclusion resulted from an independent study and analysis of the project.
 

 ¶ 17. Peavey could not reasonably rely on the representations it cites, and the record is simply absent of any evidence that it did. The trial court did not err in finding this argument meritless.
 

 C. Equitable Estoppel
 

 ¶ 18. “Equitable estoppel requires a representation by a party, reliance by the other party, and a change in position by the relying party.”
 
 Carr v. Town of Shubuta,
 
 733 So.2d 261, 265(¶ 13) (Miss.1999) (quoting
 
 Westbrook v. City of Jackson,
 
 665 So.2d 833, 839 (Miss.1995)). In order to successfully invoke the doctrine of equitable estoppel to toll the statute of limitations, the party seeking protection of the doctrine must be able to prove by a preponderance of the evidence that: (1) it was induced by the conduct of the other party not to file its complaint sooner, (2) resulting in its claim being barred by the statute of limitations, and (3) the other party knew or had reason to know such consequences would follow.
 
 Harrison Enters. v. Trilogy Commc’ns, Inc.,
 
 818 So.2d 1088, 1095(¶31) (Miss.2002) (citing
 
 PMZ Oil Co. v. Lucroy,
 
 449 So.2d 201, 206 (Miss.1984)). Inequitable or fraudulent conduct must also be established to apply the doctrine of equitable estoppel to a statute of limitations.
 
 Miss. Dep’t of Public Safety v. Stringer,
 
 748
 
 *954
 
 So.2d 662, 665(¶ 11) (Miss.1999). However, the supreme court has cautioned:
 

 [ejquitable estoppel is an extraordinary remedy and should only be invoked to prevent unconscionable results. The doctrine of equitable estoppel is not applied except when to refuse it would be inequitable. The law does not regard estoppels with favor, nor extend them beyond the requirements of the transaction in which they originate. The doctrine of equitable estoppel should be applied cautiously and only when equity clearly requires it.
 

 Harrison Enters.,
 
 818 So.2d at 1095(¶ 32) (internal citations and quotations omitted).
 
 See also
 
 54 C.J.S.
 
 Limitations of Actions
 
 § 115 at 154 (2005) (“The party who seeks to invoke equitable tolling bears the devoir of persuasion and must, therefore, establish a compelling basis for awarding such relief.”) (footnote omitted).
 

 ¶ 19. Concerning the first element, the supreme court has suggested that “inducement may consist either of an express representation that the claim will be settled without litigation or conduct that suggests a lawsuit is not necessary.”
 
 Stringer,
 
 748 So.2d at 666(¶ 15) (quoting
 
 Black v. Lexington Sch. Dist. No. 2,
 
 327 S.C. 55, 488 S.E.2d 327, 330 (1997)) (internal quotations omitted). Peavey argues:
 

 The record contains numerous documents evidencing communications between Peavey and Baan after the failed July 1999 attempt to “go live” with Phase I. From 1999 until at least 2003, Baan repeatedly told Peavey it could achieve full implementation of the software package that Peavey had purchased. The evidence of Baan’s reassurances that Baan would meet its contractual obligations and provide Peavey with a fully integrated software package as promised is sufficient to raise a fact question on the inducement element of equitable estoppel.
 

 The record, however, fails to support this claim. The trial court described the communications Peavey cites as “not representations regarding the current software, but instead a sales pitch for Peavey to purchase additional services.” On our review of the record, that is not only a fail' characterization, but the only one supported by the evidence. While Baan did offer to complete the implementation of its software at Peavey, it was conditioned on the purchase of additional software and services.
 
 [4]
 
 Furthermore, Peavey has failed to show that Baan knew or had reason to know that these offers would induce Peav-ey not to file suit or that Peavey did in fact change its position in response to these offers.
 
 [5]
 
 The record simply contains no evidence of representations or conduct of Baan that would now estop it from asserting the statute of limitations as a defense.
 
 *955
 
 The trial court did not err in finding this argument meritless.
 

 D. Continuing Tort Doctrine
 

 ¶ 20. In
 
 Stevens v. Lake,
 
 the supreme court defined the continuing tort doctrine as follows:
 

 Where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease. Where the tor-tious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong.
 

 A “continuing tort” is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.
 

 615 So.2d 1177, 1183 (Miss.1993) (quoting C.J.S.,
 
 Limitations of Actions
 
 § 177 at 230-31 (1987)). The supreme court has also stated that “continuing or repeated injuries can give rise to liability even if they persist outside the time period for the initial injury, but we noted that the defendant must commit repeated acts of wrongful conduct.”
 
 Smith v. Franklin Custodian Funds, Inc.,
 
 726 So.2d 144, 148-49(¶ 17) (Miss.1998) (citing
 
 Stevens,
 
 615 So.2d at 1183).
 

 ¶ 21. Peavey argues that its tort claims arise out of Baan’s “continuing misrepresentations that the software package Baan sold Peavey could be fully implemented to perform as promised. Those misrepresentations began in 1997, when Baan induced Peavey to purchase the software package, and continued at least through 2003, with Baan’s repeated affirmations that Baan could achieve full implementation.”
 

 ¶ 22. Peavey does not allege any specific act of fraud falling within the statute of limitations; in fact, it has admitted that the actionable torts it has alleged are barred by the statute absent tolling.
 
 [6]
 
 Peavey instead asserts that it has produced evidence of “continuing unlawful acts” in Baan’s subsequent assertions that its software was not defective.
 

 ¶ 23. As the supreme court stated: “Where the tortious act has been completed ... the period of limitations will not be extended on the ground of a continuing wrong.”
 
 Id.
 
 at 148(¶ 17) (quoting
 
 Stevens,
 
 615 So.2d at 1183). If Baan fraudulently induced Peavey to purchase defective software, the tort was completed with the purchase. Baan’s subsequent denials that the software it tendered was defective, even if false, do not transform this into a “continuing” tort. The trial court did not err in finding this argument meritless.
 

 E. Conclusion
 

 ¶ 24. As Peavey has failed to produce evidence sufficient to allow a tolling of the statute of limitations under any of the four bases it alleges, the trial court did not err in dismissing Peave/s tort claims. This assignment of error is without merit.
 

 2. Whether the trial court erred in granting summary judgment on Peavey’s contract and warranty claims arising from the Software Agreement.
 

 A. Waiver
 

 ¶ 25. Peavey argues on appeal that the trial court erred when it found
 
 *956
 
 Peavey’s breach of contract and warranty claims arising from the Software Agreement waived by a subsequent contract between the parties, signed on June 20, 2008, called the “Addendum Number Two to the Software Agreement.”
 
 [7]
 
 While the trial court did so in response to Baan’s motion for summary judgment, Baan had not argued waiver, and the trial court gave no notice to Peavey that it intended to consider this ground for summary judgment sua sponte. Peavey asserts that this violated Rule 56(c) of the Mississippi Rules of Civil Procedure and that it had a due process right to ten days’ notice that the trial court would consider summary judgment on the waiver grounds.
 

 ¶ 26. We find this argument meritorious. The Mississippi Supreme Court has recognized the importance of notice in summary judgment proceedings. Concerning a trial court’s sua sponte conversion of a Rule 12(b) motion to dismiss into a Rule 56(c) motion for summary judgment, the Mississippi Supreme Court held:
 

 The Eleventh Circuit’s strict enforcement of the notice requirements of Rule 12(b) and Rule 56 is consistent with our constitution and our case law.
 
 See
 
 Miss. Const., Art. 3, § 31 (1890);
 
 Hurst v. Southwest Miss. Legal Services,
 
 610 So.2d 374 (Miss.1992);
 
 Cunningham v. Lanier,
 
 555 So.2d 685 (Miss.1989);
 
 Pope v. Schroeder,
 
 512 So.2d 905 (Miss.1987). Considerations underlying the ten-day notice requirement of Rule 56 make it clear why this notice requirement is enforced so strictly. A successful summary judgment motion results in a final adjudication of the merits of a case.
 
 Donald v. Reeves Transport Co.,
 
 538 So.2d 1191, 1196 (Miss.1989);
 
 Jones,
 
 917 F.2d at 1533. Therefore, it is an absolute necessity that the trial court inform the parties of its intent to convert a Rule 12(b)(6) motion to a Rule 56 motion for summary judgment, and give the parties the opportunity to submit materials in opposition to the motion.
 
 Id.
 
 The requirements of Rule 56(c), far from being a mere extension of our liberal procedure exalting substance over form, represents a procedural safeguard to prevent the unjust deprivation of a litigant’s constitutional right to a jury trial. Miss. Const., Art. 3, § 31 (1890).
 
 Pope,
 
 512 So.2d at 908.
 

 Palmer v. Biloxi Reg’l Med. Ctr.,
 
 649 So.2d 179, 183-84 (Miss.1994). Moreover, the Fifth Circuit has explained that due process requires that a trial court “may not grant summary judgment
 
 sua sponte
 
 on grounds not requested by the moving party” without notice and an opportunity to respond.
 
 Baker v. Metro. Life Ins. Co.,
 
 364 F.3d 624, 632 (5th Cir.2004) (quoting
 
 John Deere Co. v. Am. Nat’l Bank,
 
 809 F.2d 1190, 1192 (5th Cir.1987)). Concerning the notice required, the Fifth Circuit has explained that “[trial] courts are widely acknowledged to possess the power to enter summary judgments
 
 sua sponte,
 
 so long as the losing party was on notice that she had to come forward with all of her evidence.”
 
 Arkwright-Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.,
 
 932 F.2d 442, 445 (5th Cir.1991) (quoting
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).
 

 ¶ 27. Peavey argues that a trial court may not grant summary judgment sua sponte on grounds not requested by the moving party without notice, but Peav-ey does not discuss what notice, if any, it
 
 *957
 
 had that the trial court may have intended to consider all of the evidence. Baan, however, has entirely failed to address this issue in its brief. We take this as a confession of error.
 
 See Sanders v. Estate of Chamblee,
 
 819 So.2d 1275, 1277(¶ 5) (Miss.2002). Accordingly, we find that the trial court did err in granting summary judgment on this issue on grounds not raised by Baan’s motion. Nonetheless, we must now consider the grounds raised in Baan’s motion, of which Peavey unquestionably had notice, as potential alternative grounds for affirming the trial court’s decision.
 

 B. Alternative Grounds
 

 ¶ 28. Baan argued in its second summary judgment motion that Peavey failed to provide timely notice of breach, as required by the Uniform Commercial Code as adopted by Mississippi. In particular, Mississippi Code Annotated section 75-2-607(3)(a) (Rev.2002) requires that “[w]here a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller or be barred from any remedy....”
 

 ¶ 29. Citing the official comment to section 2-607 of the UCC, Peavey argues that it was required only to give Baan notice that “the transaction is still troublesome and must be watched.” Baan cites a subsequent sentence from the same comment, arguing that the notification must “be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.” The conflict between these two interpretations has been acknowledged by other courts. As one court noted:
 

 Section [2 — 607(3)(a) ] does not prescribe any form for the required notification. Courts have thus developed their own guidelines for determining what constitutes adequate notice. Some courts have held that virtually any complaint about the transaction will satisfy the requirement.
 
 E.g. Northern States Power Co. v. ITT Meyer Indus., 777
 
 F.2d 405 (8th Cir.1985);
 
 Boeing Airplane Co. v. O’Malley,
 
 329 F.2d 585 (8th Cir.1964). Under this “lenient standard of notification,” the buyer must merely let the seller know that the transaction is troublesome. Other courts require the buyer to notify the seller that the buyer considers the seller to be legally in breach.
 
 E.g. Eastern Air Lines v. McDonnell Douglas Corp.,
 
 532 F.2d 957 (5th Cir.1976). The standard adopted by these courts is known as the “strict standard of notification.”
 

 United States ex rel. Conroy v. S. Contracting,
 
 862 F.Supp. 107, 111 (D.S.C. 1994). By all accounts, the “strict standard” is required by the majority of courts.
 
 See, e.g., T.J. Stevenson & Co., Inc., v. 81,193 Bags of Flour,
 
 629 F.2d 338, 360 (5th Cir.1980).
 

 ¶ 30. The notice requirement exists to prevent commercial bad faith, promote mitigation and cure, enable the seller to collect evidence while still fresh, and promote settlement.
 
 See
 
 John C. Reitz,
 
 Against Notice: A Proposal to Restrict the Notice of Claims Rule in U.C.C. § 2-607(3) (a),
 
 73 Cornell L.Rev. 534, 541-42 (1988). As the Fifth Circuit explained:
 

 As the drafters of Article 2 acknowledge, section 2-607 continues the basic policies underlying section 49 of the Uniform Sales Act. Indeed, the notice requirement developed in pre-U.C.C. eases is entirely consistent with the Article 2 goals of encouraging compromise and promoting good faith in commercial relations. As Comment 4 to section 2-607 indicates, the purpose of notice is not merely to inform the seller that his tender is nonconforming, but to open the
 
 *958
 
 way for settlement through negotiation between the pai’ties. In the words of the California Supreme Court, “the sound commercial rule” codified in section 2-607 also requires that a seller be reasonably protected against stale claims arising out of transactions which a buyer has led him to believe were closed. Early warning permits the seller to investigate the claim while the facts are fresh, avoid the defect in the future, minimize his damages, or perhaps assert a timely claim of his own against third parties.
 

 Given these undeniable purposes, it is not enough under section 2-607 that a seller has knowledge of the facts constituting a nonconforming tender; he must also be informed that the buyer considers him to be in breach of the contract.
 

 Eastern Air Lines,
 
 532 F.2d at 972-73 (citations and footnotes omitted) (applying California law). Elaborating on how to apply the notice requirement, the Fifth Circuit reasoned:
 

 [F]or merchant buyers
 
 § 2-607(3)(a) requires something more than the minimal notification.... [T]he dual policies of “encouraging compromise” and “promoting good faith in commercial relations” underlay the notice requirement. ... Notice consequently must fulfill those policies; merely indicating that the transaction is still troublesome is not enough. One way in which the policies are fulfilled is by notice informing the seller that the buyer regards the contract as breached by the seller, though specific legal rights need not be invoked.
 

 T.J. Stevenson,
 
 629 F.2d at 360 (emphasis added) (citations omitted).
 

 ¶ 31. We are not aware of any authority requiring this Court to apply one standard or the other. Nonetheless, after careful study we find that only the “strict standard of notification” applied by the Fifth Circuit can be justly applied where both parties are merchants under the UCC.
 
 [8]
 
 Peavey is without question a sophisticated merchant buyer with an experienced IT staff that undertook to make extensive modifications to the source code of the BAAN software. On appeal, Baan points out that nearly all of Peavey’s staff with personal knowledge of the project were no longer employed at Peavey. Likewise, Baan has not retained many of the documents related to the Peavey project, and it no longer employs anyone involved with the project. Peavey asserts that it has lost tens of millions of dollars over a period of more than four years because of defective software. Under the circumstances of this case, we hold that Peavey was required to meet the “strict” standard of notice described by the Fifth Circuit in
 
 Eastern Air Lines
 
 — to give reasonable and timely notice that it considered Baan to be in breach of the agreement and to provide Baan with an opportunity to cure or mitigate Peavey’s continuing damages.
 

 ¶ 32. As to the notice required, the Fifth Circuit elaborated that “the adequacy and timeliness of notice under section 2-607 typically depend upon the reasonableness of the buyer’s efforts to communicate his dissatisfaction.”
 
 T.J. Stevenson,
 
 629 F.2d at 359 n. 41 (citing
 
 United States v. Crawford,
 
 443 F.2d 611, 614 (5th Cir.
 
 *959
 
 1971)). As such, “[w]here more than one inference may be drawn from undisputed facts, or the facts are disputed, the timeliness and sufficiency of a notice of breach ... are questions for the jury to resolve. The question of reasonableness must be determined from the circumstances in the individual case.”
 
 Id.
 
 (quoting
 
 Pritchard v. Liggett & Myers Tobacco Co.,
 
 295 F.2d 292, 298 (3rd Cir.1961)).
 

 ¶ 33. Peavey argues that Baan was aware of the problems Peavey encountered during the July 1999 “go live” and that Baan knew of the compatibility issues between SCS and version IVc2 of the BAAN software used by Peavey. However, as the Fifth Circuit explained, between merchants notice that a transaction is merely “troublesome” is not enough. Instead, Peavey was required to produce evidence from which a reasonable jury could conclude that Peavey provided Baan with reasonable and timely notice that it considered Baan to be in breach of the agreement. We have scoured the record, but we have been unable to locate evidence of a single communication from Peavey to Baan where Peavey notified Baan that it considered Baan to be in breach. In fact, none of the communications cited by Peav-ey even attribute Peavey’s problems to Baan. In each of these communications, Peavey either accepted responsibility or simply described problems without attributing fault. Peavey argues that because it made Baan aware Peavey was having problems, Baan would have known Baan was responsible. This is simply not sufficient notice under the standard for merchant buyers as described by the Fifth Circuit.
 
 [9]
 

 ¶ 34. The only evidence Peavey cites that might demonstrate sufficient (if perhaps untimely) notice is an October 22, 2002, letter from Robin Long Harshbar-ger, Peavey’s ERP project manager, to Baan. In the letter, Harshbarger states:
 

 Thank you for the opportunity to discuss Peavey’s issues with the Baan Enterprise Resource Planning implementation project. I am encouraged that Baan will be considering financial concessions that one would expect from a strong, long-term business partner.
 

 [[Image here]]
 

 I feel the starting point for consideration of financial concessions should begin with the value of the unused licenses and maintenance fees. Based on my analysis this amount is $3.9 million.
 

 Attached to the letter were charts and graphs detailing the portion of the initial licensing fees and continuing license maintenance fees Peavey had paid for software it asserted it had never used.
 

 ¶ 35. On appeal, Peavey characterizes this letter as a “written complaint” over Peavey’s “issues” that includes a “demand for at least $3.9 million in ‘concessions.’” Peavey’s arguments, however, are not evidence. The document itself does not support this characterization, and Peavey cites to no context in the record supporting its arguments. Instead, it is evident from the document and the other evidence that the
 
 *960
 
 “issues” Peavey cited were not problems with the software, but the mere fact that Peavey had not been using some of the software it had been paying for. Harsh-barger, who left Peavey in 2004, explained:
 

 As part of these discussions with Baan, I negotiated concessions for Peav-ey on Baan’s offered pricing and fees for additional software and services. As part of this effort, I explained to Baan that Peavey had paid for licenses and maintenance on a variety of software that Peavey, due to Peavey’s own decision to stop Phase II of the project, had not used in live production. This included user seats for the Baan IV manufacturing modules and the Baan SCS software and other Phase II parts of the project which Peavy had put on hold in the Fall of 1999 and had never completed.
 

 During these discussions with Baan, I never told Baan or any of its representatives that any of Baan’s software was defective.... I was instead trying to negotiate for Peavey a better price from Baan for future software and services.
 

 ¶ 36. It is evident from the record that Baan shared this understanding of the letter,
 
 [10]
 
 and Peavey has simply produced no evidence that would allow a jury to accept its characterizations and arguments. Indeed, the record contains no evidence from which a jury could find that Peavey provided Baan with reasonable and timely notice that it considered Baan to be in breach of their agreement. Mississippi Code Annotated section 75-2-607(3) therefore bars Peavey from any remedy on the Software Agreement. Accordingly, the trial court did not err in dismissing Peavey’s contract and warranty claims stemming from the Software Agreement, and this assignment of en*or is without merit.
 

 3. Whether the trial court erred in granting summary judgment on Peavey’s contract and warranty claims arising from the Services Agreement.
 

 ¶ 37. Peavey argues that the trial court erred in dismissing its contract claims based on the Services Agreement. The trial court found this agreement to be governed by the general three-year statute of limitations provided by Mississippi Code Annotated section 15-1-49. As Baan’s consultants left Peavey’s site after Peavey stopped the implementation in October 1999, the trial court concluded that Peav-ey’s breach of contract claims based on the Services Agreement were barred by the statute of limitations. Peavey argues that the trial court should have interpreted that contract under the UCC and, thus, applied the six-year statute of limitations provided by the UCC.
 
 See
 
 Miss.Code Ann. § 75-2-725 (Rev.2002).
 

 ¶ 38. The UCC governs “transactions in goods.” Miss.Code Ann. § 75-2-102 (Rev. 2002). Peavey does not argue that the Services Agreement is a contract in goods; it argues that the trial court should have construed the Software Agreement and the Services Agreement together as a single, mixed transaction for the sale of goods and related services. Peavey argues that
 
 *961
 
 because its suit against Baan relates primarily to the goods provided, the UCC and its six-year statute of limitations on contract actions should be applied to the entire mixed transaction, including the Services Agreement. Baan replies that the parties entered into two written contracts for two distinct transactions, and Baan further asserts that even if we were to take the two agreements as single transaction, Peavey’s claims on the Services Agreement clearly relate to services, rather than goods.
 

 ¶ 39. The supreme court has stated that “when separate documents are executed at the same time, by the same parties, as part of the same transaction, they may be construed as one instrument.”
 
 Sullivan v. Mounger,
 
 882 So.2d 129, 135(¶ 32) (Miss.2004). When the individual agreements are “integral and interrelated parts of ... one deal,” those individual contracts should be treated as part of a single transaction.
 
 Id.
 
 at 134(¶ 29). Peav-ey also cites to
 
 Dexter Axle Co. v. Baan USA, Inc.,
 
 833 N.E.2d 43 (Ind.Ct.App.2005), where under what Peavey asserts are analogous facts, Baan successfully argued that two contracts, a Software Agreement and a Consulting Agreement relating to ERP software, were part of a single transaction.
 

 ¶ 40. Even if this Court were to accept Peavey’s argument that the Software Agreement and the Services Agreement should be construed together as a single, mixed transaction, we would not necessarily apply the UCC to Peavey’s claims. “[W]hether or not the contract should be interpreted under the UCC or our general contract law should depend upon the nature of the contract and also upon whether the
 
 dispute
 
 in question primarily concerns the goods furnished or the services rendered under the contract.”
 
 J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co., Inc.,
 
 683 So.2d 396, 400 (Miss.1996). Peavey argues that, although its claims relating to the Services Agreement clearly concern services, the gravamen of the dispute between the parties is the quality of the software provided. On the face of the complaint Peavey filed, this may be so, but we have already held that the trial court properly dismissed Peavey’s claims relating to the software; only Peav-ey’s services claims remain. Considering Peavey’s claims now before the court, this dispute only concerns the quality of the services rendered. This transaction, therefore, is governed by general contract law and its three-year statute of limitations. Accordingly, the trial court did not err in dismissing Peavey’s contract claims stemming from the Services Agreement, and this assignment of error is without merit.
 

 4. Whether the trial court erred in denying Peavey’s motions to compel discovery.
 

 ¶ 41. Peavey argues that the trial court abused its discretion in denying its motions to compel certain discovery. Particularly, Peavey cites to two orders where the trial court refused to compel Baan to produce all research and development records of the BAAN software, as well as all records of customer complaints or lawsuits relating to the BAAN software.
 

 ¶ 42. Peavey asserts that this discovery was relevant to its claims. While that is no doubt true to some extent, our standard of review is more limited; that is, we review a trial court’s denial of discovery for an abuse of discretion.
 
 Dawkins v. Redd Pest Control Co.,
 
 607 So.2d 1232, 1235 (Miss.1992). More importantly, an erroneous denial of discovery does not warrant reversal if it is apparent that the error was harmless.
 
 Id.
 
 at 1236. This is so when it is clear from the record that the
 
 *962
 
 requested documents would not have changed the result in the trial court.
 
 Id.
 

 ¶ 43. The requested documents could have no bearing on our analysis of Peav-ey’s contract and warranty claims relating to the Software and Services Agreements. Instead, Peavey asserts that the discovery it requested would have allowed it to establish that the statute of limitations on its tort claims was tolled by fraudulent concealment and equitable estoppel.
 

 ¶ 44. Fraudulent concealment requires “some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim.”
 
 Stephens v. Equitable Life Assurance Soc’y,
 
 850 So.2d 78, 83(¶ 18) (Miss.2003) (quoting
 
 Reich v. Jesco, Inc.,
 
 526 So.2d 550, 552 (Miss.1988)). We have already found the record to contain no evidence that Baan prevented, or indeed could have prevented, Peavey from discovering its claim. Peavey was aware that it had problems with the software, had access to all of the relevant software — including its source code — and possessed the resources to discover the full extent of its injury. As such, Peavey had no hope of proving fraudulent concealment even with the benefit of the additional discovery it requested. As to equitable estoppel, w?e cannot imagine how research and development records or customer complaints — evidencing, as Peavey argues they would, Baan’s awareness of problems with its software — would allow Peavey to show that it was induced not to file suit within the statute of limitations.
 

 ¶ 45. Any error was necessarily harmless, as the discovery Peavey asserts it was wrongly denied would not have prevented summary judgment from being entered for Baan. This assignment of error is without merit.
 

 ¶ 46. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY. ROBERTS AND MAXWELL, JJ., NOT PARTICIPATING.
 

 [1]
 

 . In the record, the SCS suite is referred to by many names, including Supply Chain Solutions (SCS), MOOPI, Berclain, Baan Sync, Baan Synchronization, Baan Scheduler, and Baan Execution. SCS was to “allow for finite, constraint-based planning in Peavey’s manufacturing system.”
 

 [2]
 

 . On appeal, Peavey relies on the theory that SCS could not be "fully integrated” with the version IVc2 of the BAAN software that Peav-ey had implemented. Because Peavey had heavily customized the software, it could not upgrade to a fully SCS-compatible revision of the BAAN IVc software without considerable difficulty and expense that other users of the BAAN software would not face. It appears that Baan had provided Peavey with a later version of the BAAN software, IVc4, which Baan asserts could be "fully integrated” with SCS.
 

 Also, although Baan argues that Peavey's allegations concerning SCS are "belated” because they were not asserted for the first year and a half of the litigation, it is apparent from the record that Peavey did make this argument in time for the trial court to consider it
 
 *952
 
 on the partial summary judgment motion, so we shall consider it on appeal.
 

 [3]
 

 . Baan has argued that Peavey chose not to continue with the implementation of “Phase II” because it decided to organize its manufacturing operations in a way that would not utilize the "manufacturing module” of the BAAN software, without which SCS cannot be used. Robert Muirhead, who worked on the ERP project as a systems analyst at Peav-ey, explained by affidavit that “Peavey understood before it paused the implementation that it could not simply complete the Baan IV implementation, because the initial phase of the implementation had been on Baan IVc2, and after this phase of the implementation, Baan began advocating an upgrade to IVc4 so Peavey could realize the essential SCS functionality.” Diane Johnson, another of Peav-ey’s witnesses, repeated this assertion word-for-word in her affidavit. Peavey acknowledges that the implementation of Phase II was paused in the fall of 1999.
 

 [4]
 

 . Mark Kuchenrither, whose affidavit Peavey cites, elaborated that:
 

 My conversations with Baan personnel included discussion about Peavey entering into a true partnership with Baan (but not a legal partnership) in which Peavey and Baan would have a closer relationship than just customer and vendor. Baan would fix the problems that Peavey had experienced with Baan IV, and Peavey would invest in and go live on the latest version of Baan software.... In these discussions, Baan personnel made proposals calling for Peav-ey to spend more than $1 million on future efforts to implement Baan software.
 

 [5]
 

 . We share the trial court’s skepticism that Peavey could have reasonably relied on the representations it cites. While Peavey no doubt investigated the issues surrounding the failed "go live” of Phase I, the record lacks any evidence of due diligence by Peavey to investigate the issues between SCS and the version of the BAAN software it implemented. As the supreme court has stated: "One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence.”
 
 Grant v. State,
 
 686 So.2d 1078, 1085 (Miss.1996) (quoting
 
 Baldwin County Welcome Ctr. v. Brown,
 
 466 U.S. 147, 151, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)).
 

 [6]
 

 . Our analysis is complicated by the fact that, as the trial court noted, Peavey did not plead with particularity the "who, what, and when” of the actionable fraud it alleges outside the statute of limitations.
 

 [7]
 

 . This contract reduced the number of licensed Peavey users on the BAAN software from 500 to 175 and reduced some continuing support fees. The "Addendum Number Two" otherwise provided that the Software Agreement "shall remain in full force and effect.”
 

 [8]
 

 . Mississippi Code Annotated section 75-2-104(1) (Rev.2002) provides that ''merchants” include not only “a person who deals in goods of the kind” but also one who "by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent ... who by his occupation holds himself out as having such knowledge or skill.”
 

 [9]
 

 . The Fifth Circuit quotes Judge Learned Hand from a pre-UCC case:
 

 The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice "of the breach" required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer’s claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.
 

 Eastern Air Lines,
 
 532 F.2d at 972 (quoting
 
 Am. Mfg. Co. v. U.S. Shipping Bd. Emergency Fleet Corp.,
 
 7 F.2d 565, 566 (2d Cir.1925)).
 

 [10]
 

 . For example, the record contains an internal Baan e-mail where a Baan employee discusses the letter:
 

 Here’s a little analogy-If I buy a castle and use only 4 of the 20 rooms whose problem is it the realtor or the buyer? If I choose to heat the other 16 rooms that I don't use for 3 or 4 years can I go to the utility company and say give me the money back for the energy I used to heat those 16 rooms because I never received any warmth since I never went into those rooms? ... If Peav-ey bought more licenses than they needed its [sic] their problem. If they paid maintenance on more licenses than they used its [sic] also their problem.